**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

Case Number: _____

HOLMWOOD CAPITAL ADVISORS, LLC, a
Delaware limited liability company, and
HOLMWOOD CAPITAL, LLC, a Delaware
liability company,

     Plaintiffs,

v.

KAPLAN VOEKLER CUNNINGHAM &
FRANK PLC, a Virginia professional
limited liability company,

     Defendant.

_____/

## **COMPLAINT**

Plaintiffs Holmwood Capital Advisors LLC and Holmwood Capital, LLC sue Defendant

Kaplan Voekler Cunningham & Frank PLC, upon the following actions and averments.

## **PARTIES AND JURISDICTION**

1.     This is an action for damages and disgorgement relief against a law firm fiduciary

as a result of inappropriate actions, inactions, improper and false advice, breaches of professional

standards of care, and breaches of loyalty and trust in connection with events, circumstances, or

conditions that were taken or occurred in the Middle District of Florida.

2.     The causes of action herein seek damages in excess of $75,000, exclusive of

interest, costs, and attorneys' fees.

*Holmwood Capital Advisors, LLC et al. v. Kaplan Voekler Cunningham & Frank PLC*
Complaint
Page 2

3.      Plaintiff Holmwood Capital Advisors, LLC ("HCA") is a Delaware limited liability company with its principal place of business in Sarasota, Florida.

4.      Plaintiff Holmwood Capital, LLC ("HC") is a Delaware limited liability company with its principal place of business in Sarasota, Florida.

5.      Originally HC was established to acquire and manage government leased real estate properties. Subsequently, HCA was set up to separately manage the portfolio of properties, that had been acquired by HC.

6.      Thus, Plaintiff HCA became the organizing, controlling and management entity for an affiliated group of entities to acquire and hold commercial real estate properties subject to long-term leases with federal government tenants.

7.      Defendant Kaplan Voekler Cunningham & Frank PLC ("KVCF") is a Virginia professional limited liability company which at all material times did business in Florida, including delivery of legal advice and services to Plaintiff at its headquarters in Sarasota.  Members of Defendant, and its attorneys are residents of Virginia, conducting business within the course and scope of their agency, membership and/employment by KVCF.

8.      Defendant's legal services included support for Plaintiffs' organizational, management, investment, acquisition and related management activities conducted from Sarasota, situated in the Middle District of Florida.

9.      As to each cause of action set forth in this Complaint (this "Complaint"), the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

10.     Jurisdiction over this cause exists pursuant to Title 28 of the United States Code, § 1332(a)(1).

11.     Venue in this Court is proper pursuant to Title 28 of the United States Code 1391(b)(2).

## FACTUAL BACKGROUND

12.     At all material times, KVCF's services and responsibilities were offered and delivered by and through its authorized attorneys, including Robert R. Kaplan, Sr. and Robert R. Kaplan, Jr. (respectively, "Kaplan Sr." and "Kaplan Jr."; collectively, "the Kaplans"), as well as Rhys James, Richard Cunningham, Thomas Voekler, Zachary Grabill, Brian Pearson, Stephanie Karn and Chris Hoctor.

13.     At all material times, the Kaplans were principals of KVCF, authorized to serve the firm's clients, including Plaintiffs and entities affiliated with and served by Plaintiffs.

14.     The Kaplans and their law firm specialize in corporate law, including capital formation, mergers and acquisitions, and securities compliance.

### KVCF's Prior Attorney-Client Relationship

15.     In 2006, Edwin Stanton formed SRS Investments, LLC, which operated as a private equity real estate investment firm based in Sarasota, Florida. Throughout SRS's activity, Stanton was chiefly responsible for the company's sourcing, acquisition, financing, and management of investment properties.

16.     During the early stages of SRS's existence, Stanton met Kaplan Jr., who marketed himself and KVCF's predecessor as being highly expert in real estate law, securities and corporate transactions. Kaplan Jr. pursued Stanton for over a year, after which Stanton agreed to engage KVCF as attorneys.

17.     KVCF performed legal services pursuant to Kaplan Jr.'s proposed arrangement by which KVCF received attorneys' fees for each successful transaction that SRS completed.

18.     In late 2010, Stanton created Plaintiff HC (Holmwood Capital, LLC; originally named EMS-CHI, LLC), to acquire government-leased commercial real estate investments. Stanton informed Kaplan Jr. of this business plan to launch a new venture that would focus on the acquisition and aggregation of single-tenant federal government leased real estate.  By his prior involvement with Stanton and SRS, Kaplan, Jr. was intimately familiar with the potential profitability of such a venture, and upon discussion, proposed for his firm (KVCF) to provide all of the required legal representation needed in exchange for a fifty (50%) percent profits interest in each future property acquired.  Trusting his attorney, Stanton agreed.

19.     At no time did Kaplan Jr. or KVCF disclose to HC or Stanton that such a split-profit fee arrangement between lawyer and client was unorthodox, or that such an arrangement raised conflicts of interest between lawyer and client.  Nor did Kaplan Jr. or KVCF advise that separate counsel should be consulted.  Instead, Kaplan Jr. instructed Stanton that this sort of arrangement was proper.  In light of the prior relationship that existed with KVCF, Stanton had no reason to believe otherwise.

20.     During May 2011, Kaplan Jr. approached Stanton and suggested that Kaplan Sr., his father and law partner at KVCF, should become involved to provide additional legal support, and share the agreed 50% profit interest compensation, creating no added expense burden.  Still valuing KVCF as his trusted advisors, Stanton did not object, and welcomed the additional legal representation resource for himself and HC.

21.     When Kaplan Sr. became involved, KVCF operated under the same fee arrangement that Kaplan Jr. had arranged. At no point did the Kaplans or KVCF attempt to formally document the relationship in writing, nor did the Kaplans or anyone else from KVCF disclose that a split-profit fee arrangement between lawyer and clients was unorthodox, or that the

arrangement would raise potential or actual conflicts of interest between lawyer and the clients, or that independent counsel should be consulted.

22.     After a few months, HC closed on its first acquisition relating to a property in Lorain, Ohio acquired for about $3,372,157.96.  KVCF's attorneys provided all necessary legal work.  After the success of HC's initial acquisition, Stanton continued to source acquisitions and pursue financing, with KVCF providing all legal services to HC and related holding entities.

23.     By 2012, Stanton raised the prospect of sourcing additional acquisitions, for which HC needed additional capital.  To address financing, KVCF recommended involvement of one of KVCF's other relationships, a gentleman they knew to have ample access to capital, Dr. Philip Kurlander.  Kaplan Sr. served as general counsel and KVCF served as corporate counsel for a company in which Kurlander invested and which Kurlander  and Kaplan, Sr. were board members of that company.

24.     Kurlander became a lender, providing funding for HC's second major acquisition.

25.     After the success of the second acquisition, Stanton, Kurlander and the Kaplans discussed the concept of formalizing an ownership relationship.  At this time, Stanton was the sole owner of HC, Kurlander was a lender who sought an equity interest, and KVCF was providing legal services for Stanton, Kurlander and HC.

26.     In November 2012, KVCF through the Kaplans proposed and created a written Operating Agreement for HC with Stanton, Kurlander and the Kaplans as disproportionate owners.  Upon doing so, KVCF through the Kaplans, simply advised that KVCF had created a "standard" legal document, and that even though the members' equity interests were disproportionate, equal voting power was required.  This was not true.

27.     The HC Operating Agreement resulted in two of KVCF's principals becoming co-

owners, with two of KVCF's clients, in another of KVCF's clients.

28.     KVCF did not provide a written agreement regarding its legal representation or fee arrangement and did not disclose that any aspect of the attorneys' relationship created any actual or potential conflicts of interest or that any client should seek independent counsel.  To the contrary, Kaplan Jr. had represented that the advantage of the Kaplans having an ownership interest was to save payment of legal fees for all involved and since the principals were all in it together, there was no need to seek additional or outside legal advice. At no time did the Kaplans or KVCF advise that the interests of the Kaplans or KVCF were or could become adverse to those of KVCF's clients, HC, Stanton and Kurlander.

29.     After execution of the HC Operating Agreement, HC grew through additional acquisitions.

30.     During 2014, The Kaplans and KVCF advised that a private equity structure utilizing limited liability companies with a Regulation D investment capital offering was the best way to grow the HC portfolio.

31.     KVCF further advised that management of the portfolio and its properties, and of company operations, should be separated from ownership of the portfolio and placed in a different entity than HC, which entity (HCA, to be formed) should be controlled by the principals involved, to include the Kaplans as equal share owners, again as part compensation for legal services to be performed. At this time neither the Kaplans nor KVCF advised that the interests of the Kaplans or KVCF were or could become adverse to those of KVCF's clients, HC, HCA, Stanton and Kurlander.

32.     In early 2015, KVCF created two separate Regulation D offering memoranda.

KVCF then advised that Regulation D was not gaining traction with KVCF's other clients and advised that Regulation A was the best way to raise capital.  KVCF touted its proficiency as Regulation A experts.  KVCF advised that Regulation A required a majority independent board of directors, which was false, and the Kaplans pushed that they would secure such advisory board with minimal direction.

### Formation of HCA Represented by KVCF

33.     In reliance upon the foregoing legal advice and representations, HCA (Holmwood Capital Advisors, LLC) was formed in July 2014 as the management entity for HC and the portfolio of properties.  Even though Stanton, who was the original founder and sole operator and Kurlander owned the large majority of the HC portfolio that was to be managed by HCA, upon advice of the Kaplans and KVCF, HCA was structured as a four-member limited liability company, with 25% ownership interests in each of Stanton, Kurlander, Kaplan Jr., and Kaplan Sr. (Kurlander was provided an additional vote several years later in late August 2018).  The Kaplans' ownership interest in HCA, consistent with their ownership interest in HC, was considered in substantial part, as consideration for KVCF's continuing legal representation of the business.

34.     In March 2015, consistent with the plan for HCA to control the Company's business and its operations, HC's Operating Agreement was amended to vest in HCA "complete and exclusive control of the management of the Company's business and affairs…and the Members shall have no right to participate in the management or the conduct of the Company's business and affairs nor any power or authority to act for, or on behalf of, the Company in any respect whatsoever." At this time, neither the Kaplans nor KVCF provided instruction or advice to HC or HCA, that undertaking these actions were in these entities' best interests, rather than the interests of the Kaplans and KVCF. Indeed, no attempt was made to insist on obtaining the opinions of

outside counsel as Stanton and Kurlander, on behalf of HC and HCA, were relying upon KVCF and the Kaplans to provide legal advice and representation in the best interests of HC and HCA, rather than their own interests.

35.     KVCF handled all aspects of HCA's creation, and created all of HCA's corporate documents, including HCA's Limited Liability Company Agreement executed March 1, 2015.

36.     Contrary to its client's best interests and without alerting anyone, KVCF improperly inserted in the HCA operating agreement an anti-dilution provision that effectively prevented new equity or capital infusion for future growth of HCA as operations manager, and essentially locked in and protected the Kaplans' ownership interests for future profitability.

37.     The Kaplans again advised that KVCF had created "standard" legal documents. This was misleading since an anti-dilution provision was not present in the HC Operating Agreement.  Kaplan Jr. further represented that the operating agreement for HCA was identical to the operating agreement for HC, which was not true, then instructed Stanton and Kurlander to "just sign" the documents for HCA and HC because there was "only one way of doing it" and "that was the way it needed to be done."  Kaplan Sr. urged that everyone should just sign the documents and they were standard, and everyone was in the deal together.

38.     In performing these legal services, KVCF did not advise HC and HCA about the possibility of potential or actual conflicts of interest, or that HC and HCA should consult with separate counsel.

39.     After the formation of HCA, the HC portfolio continued to grow under HCA management.  Stanton identified and negotiated new opportunities, and Kurlander provided (loaned, advanced, or guaranteed) all cash and credit necessary to consummate the acquisitions. Throughout this time, KVCF continued to be legal counsel for HCA, HC , Kurlander and Stanton,

and as the principal owners of HCA and HC as well as each of the properties individual LLCs

40.     As the HC portfolio grew, so grew HCA's prospects for revenue and growth. By the end of 2015, HCA was managing a HC portfolio that included seven properties, all of which were one hundred (100%) percent leased to the federal government. The HC portfolio had grown to a total value of about $33,750,000, with equity of approximately $7,000,000.

41.     In early 2016, upon advice of KVCF, Plaintiffs HCA and HC created a complicated restructuring of the portfolio incident to the Regulation A offering to raise additional capital:

- HC Government Realty Trust, Inc. and HC Government Realty Holdings, LP (together, the "REIT") were formed primarily to own government-leased commercial real estate investments, and to permit pursuit, through an exempted public offering pursuant to Regulation A of capital investment up to $30 million;

- Holmwood Portfolio Holdings LLC, owned by HC , was formed as a limited partner of HC Holdings;

- Holmwood Capital Management, LLC, was formed as a sub-manager with HCA being its sole member and manager;

42.     HC transferred its portfolio of property holdings to the REIT, in exchange for operating partnership units in the REIT. The portfolio of HC's property holdings was transferred under the advice and direction of KVCF, with the understanding that the operating partnership units would have the same material rights as the common stock shareholders. However, KVCF drafted the documents to exclude voting rights for operating partnership units. But KVCF never disclosed or advised HC and HCA that the operating partnership unit holders' status was materially adverse to HC's and HCA' interests. The attorneys at KVCF Kaplan Jr., Kaplan, Sr. and Stanton and Kurlander each also each received 50,000 founders' shares in the REIT. The Kaplans'

founders' shares in the REIT thus continued as part of KVCF's fee compensation for continuing legal work for HCA as the controlling management entity for the REIT, creating further undisclosed conflicts of interest.

43.     The Kaplans and KVCF advised HC and HCA (through Stanton and Kurlander) that transferring HC's portfolio of property holdings to the REIT was in the best interests of HC and HCA. KVCF never advised HCA and HC about the risks and potential loss of control over their equity and business interests. The Kaplans and KVCF failed to disclose their personal interests and the conflict that it created between the firm, HCA, HC and the REIT. Further, no advice was provided to HC and HCA on whether the interests acquired by the Kaplans and KVCF were justified financially, legally, or were a reasonable component of their legal representation. Such advice was required to be provided, prior to the Kaplans and KVCF acquiring these financial interests in their clients' business enterprise. Indeed, no action was taken to protect the interests of their clients, HC and HCA, and in fact KVCF and its attorneys engaged in conduct that was designed to deceive, and in fact did deceive their own clients, HC and HCA. To make matters worse, KVCF and its managers and attorneys knew of the lack of disclosures at the time these transactions where undertaken and that HC and HCA had not been advised of the serious potentially adverse consequences of proceeding with the transactions as drafted and formulated by KVCF.

44.     HCA has also incurred a $400,000 liability to a third-party due to KVCF obligating HCA to repurchase the operating partnership units from the third-party. HCA was advised by KVCF that the REIT would have the ultimate obligation to purchase the operating partnership units from HCA as a pass-through from the third-party. However, KVCF failed to document the REIT's obligation to purchase the operating partnership units from HCA. When the demand was

made to HCA by the third-party to repurchase his operating partnership units, the REIT refused to purchase the operating partnership units from HCA.

45.     All documents associated with the above organization structuring were counseled and prepared entirely by the attorneys at KVCF.  At that time, HCA had been in existence for more than a year, during which KVCF was its legal counsel.

46.     KVCF did not disclose to HCA or HC the existence of any actual or potential conflict of interest or propose any conflict waiver or offer any suggestion to seek advice of independent counsel because KVCF was creating entities with which HCA would be expected to control, operate and manage; and for which KVCF would serve as counsel (at the same time the KVCF and/or the Kaplans held a financial interest in those entities).  KVCF drafted, presented and recommended a proposed "HCA Management Agreement" to be executed by and among HCA, and the REIT. The HCA Management Agreement was executed March 1, 2016, but KVCF did not disclose to HCA that a potential or actual conflict of interest existed or may exist for counsel to advise concerning the terms of and to prepare a contract between clients, especially when HCA expected to control the business and operations of the other client entities, and in which the Kaplans and KVCF were assuming (and furthering their) management and ownership interests

47.     The documentation created by the Kaplans and KVCF did not reflect and protect HCA's intent and interest to fully manage and control the business of all operations due to the Kaplans' and KVCF's lack of care and interest in their clients, instead seeking to further their own interests.

## The HCA Management Agreement

48.     Until March 31, 2020, the REIT was managed by HCA pursuant to the HCA Management Agreement, which collectively defined HC REIT and HC Holdings as the

*Holmwood Capital Advisors, LLC et al. v. Kaplan Voekler Cunningham & Frank PLC*
Complaint
Page 12

"Company" (herein defined as "the REIT"). The Management Agreement memorialized the REIT's retention of HCA "to administer the business activities and day-to-day operations of the Company . . . and to perform services for the Company," as well as HCA's desire to provide such services. This was consistent with HC's operating agreement that vested exclusive control of management of business and business affairs in HCA.

49.     Section 2 of the HCA Management Agreement, in enumerating HCA's powers and duties as Manager, provided that "[a]ll rights and powers to manage and control the day-to-day business and affairs of the [REIT] shall be vested in the Manager."  Section 2 further provided that HCA, subject to the REIT's Board's supervision, shall have the "power to direct the management, operation and policies of the [REIT] . . . [and] shall have the power by itself and shall be authorized and empowered on behalf and in the name of the [REIT] to carry out any and all of the objectives and purposes of the [REIT]." HCA was responsible for "(1) the selection, purchase, sale and disposition of Investments, (2) the [REIT's financing activities, and (3) providing the REIT  with advisory services,"   and for "investigating, analyzing, and selecting possible Investment opportunities and acquiring, financing, retaining, selling, restructuring, exchanging or disposing of Investments consistent with the Investment Guidelines."[1]

50.     In connection with these provisions, specifically, but without limitation, no disclosure was made by the Kaplans or KVCF of the potential effect upon HCA and HC to manage

---

[1] The "Investment Guidelines" appended to the Management Agreement provided as follows:

1.     No investment shall be made that would cause [the REIT] to fail to qualify as a REIT under the Code.
2.     No investment shall be made that would cause [the REIT] to be regulated as an investment company under the Investment Company Act.

and control the business enterprise and the potential loss of control to which HCA and HC could be subject, contrary to HCA's and HC's business and financial interests. This failure by the Kaplans and KVCF was compounded by the financial interest obtained by the Kaplans and KVCF without disclosure of the ramifications upon HC and HCA, by the acquisition of these interests and the conflict of interest inherent in those interests relative to the best interests of HCA and HC. In point of fact, the Plaintiffs and Kaplans' interests were disjointed, with the HC Operating Agreements serving as another catalyst for the Kaplans' and KVCF's scheme to usurp control of HCA and HC, and the entire property investment venture as set forth herein.

### HCA's Compensation as Company Manager

51.     HCA's compensation was memorialized in Section 6 of the Management Agreement, wherein the Company was obligated to pay HCA an Asset Management Fee, a Leasing Fee, and an Acquisition Fee for services rendered.

52.     The annual Asset Management Fee, which was "intended to compensate the Manager for advisory services and certain general management services," was 1.5% of the amount of Stockholder's Equity (exclusive of depreciation and other non-cash items), calculated and paid quarterly.

53.     As compensation for its services in leasing the Investments, the Management Agreement provided that the HCA Manager is entitled to a Leasing Fee "equal to 2.0% of the Base Rental Income . . . for any new lease or lease renewal entered into or exercised during the term of this Agreement," that includes "all gross rent due during the term of the lease or lease renewal."

54.     The HCA Manager also received "an Acquisition Fee of 1.0% of the Acquisition Cost for each Investment made on behalf of the [the REIT] at the closing of the acquisition of such Investment," to compensate for "identifying Investments for purchase, arranging for the purchase

of such Investments, coordinating closing on such Investments and following up on and resolving post-closing transaction issues on behalf of the [the REIT]."  The Acquisition fee was to be paid in Common Stock or other equity securities of [the REIT], as determined by mutual consent.

55.    Under Section 7 of the HCA Management Agreement, the Manager and its affiliates were entitled to be reimbursed for documented expenses incurred on behalf of any of the REIT's related entities including costs and expenses incurred associated with the establishment and maintenance of any of the REITs credit facilities, other financing arrangements, or other indebtedness of the REIT, including any of the REIT's securities offerings.

56.    The Initial Term of the Management Agreement was to continue in operation through March 31, 2018.  After the Initial Term, the HCA Management Agreement would automatically renew each year for an additional one-year period unless the REIT or the Manager elected to terminate the HCA Management Agreement by non-renewal.

57.    The REIT could terminate (non-renew) the HCA Management Agreement upon 180 days' notice before expiration of any renewal term.  The affirmative vote of at least two-thirds of the Independent Directors was required for the REIT to non-renew the Agreement.

58.    Upon termination, the Manager was entitled to be paid all compensation accruing to the date of termination.

59.    Upon non-renewal becoming effective, payment of a highly beneficial Termination Fee to HCA was required.  Depending on the amount of equity at the time, the payable Termination Fee was up to three (3) times the sum of (i) the Asset Management Fees, (ii) Acquisition Fees, including acquisition fees still owed, and (iii) Leasing Fees earned by the Manager during the 24-month period ending as of the most recently completed fiscal quarter prior to the Termination Date. The Termination Fee could be paid in whole or part in cash or equity securities of the REIT or a

*Holmwood Capital Advisors, LLC et al. v. Kaplan Voekler Cunningham & Frank PLC*
Complaint
Page 15

combination thereof at the discretion of the REIT with the choice of the type of securities to be mutually agreed upon between the REIT and HCA.

60.     The Termination Fee provision was intended to fully remunerate HCA's Members for their efforts in building the REIT through the point that HCA decided to approve a proposed sale, buy-out or other transaction for which t the REIT Board of Directors could formally provide final approval and consummation, so HCA and HC could maximize return on their investment.

61.     Only upon HCA's evaluation, approval and recommendation of any such proposed transaction – pursuant to HCA's Management Agreement authority – could the REIT Board vote to approve (ratify) any transaction that would result in termination of the HCA Management Agreement and the payment to HCA of the Termination Fee and all unpaid and accrued fees.

62.     It was not intended that the HCA Management Agreement would be terminated unless HCA advised and recommended to the REIT Board of Directors, a financial transaction necessitating termination. No action could be taken by the REIT regarding its business or operations without affirmative approval and recommendation of HCA. At no time did the Kaplans or KVCF advise HCA and HC that these provisions of the HCA Management Agreement could or would be utilized in such a fashion to be contrary to the best interests of HCA and HC. In violation of their duties, KVCF and the Kaplans failed to act in conformance with their professional and ethical obligations and to avoid conflict of interest transactions from which the Kaplans and KVCF intended to benefit, to the detriment of HCA and HC.

### The Hale Recapitalization Proposal

63.     In early September 2018, at the urging of Kaplan Jr., and without the knowledge and consent of HCA, the REIT Board of Directors was presented with a potential financial investment in the REIT by Hale Partnership Capital Management, LLC ("Hale"). Over several

months from September 2018 through March 2019, multiple iterations resulted in terms suggested by Hale and the Kaplans for a "Recapitalization Transaction" that included: a change of control of the REIT Board of Directors to be appointed by Hale, issuance of a secured loan for up to $20,500,000 at 14% interest to the REIT; purchase of 2,050,000 shares of REIT Series B Preferred Stock for $20,500,000 with a coupon of 10% convertible at net asset value; purchase of 300,000 shares of REIT common stock for $3,000,000; new investment guidelines for HCA that severely limited HCA's ability to perform under the HCA Management Agreement; and issuance of notice of non-renewal termination of HCA's management contract.

64.     Kaplan Jr. facilitated and caused the Hale financing proposal to be presented to the REIT Board of Directors, without prior review and approval by HCA, as previously contemplated and understood by Stanton and Kurlander on behalf of HC and HCA, would be required to occur. KVCF did not discourage or advocate against the Board's discussion and consideration of the Hale proposal despite knowing that HCA and HC, its clients, had not considered, favorably advised, or approved the Hale proposal, and that same was contrary to HCA's and HC's best interests. Nor did the Kaplans or any KVCF attorney, as counsel for HCA and HC, or otherwise, inform the REIT that HCA must consider and approve any such proposed financing that would affect the operations and affairs of the REIT. The Kaplans and KVCF failed to take any action on behalf of HCA to prevent the REIT from acting contrary to HCA's contracted authority pursuant to the HCA Management Agreement.

65.     On March 13, 2019, the REIT Board of Directors, at the direction of and by action of Kaplan Jr. — acting without authority on behalf of HCA and HC as their counsel — held a special meeting to consider the Hale Recapitalization Transaction. Again, at no time did the Kaplans or attorneys for KVCF, representing both HCA, HC and the REIT, discourage or advise

against the Board's vote on the Hale Recapitalization proposal without prior consideration and approval by HC and HCA, pursuant to HCA's corporate management responsibility and authority,

66.    At the special meeting of March 13, 2019, a majority of the REIT Board of Directors, including the Kaplans and "Independent" Directors (that were appointed by the Kaplans) approved (again without full disclosure of the conflict of interest to HCA and HC), the proposed Hale Recapitalization Transaction, and directed a 180 days' written notice to HCA to terminate (non-renew) the HCA Management Agreement, effective March 31, 2020.

67.    Kaplan Jr., Kaplan Sr. and other KVCF members advocated in favor of the REIT Board's adoption of Hale's proposal, and encouraged and supported the Board's decision to approve the Hale proposal. These actions violated the Kaplans' and KVCF's obligations to their clients, HCA and HC, among others.

68.    KVCF served as counsel for the REIT with respect to the Hale proposal and for the resulting take-out recapitalization transaction, despite knowing the transaction was opposed by its clients HCA and HC as contrary to HCA's and HC's interests. At no time did the Kaplans or KVCF disclose this conflict of interest, or the ramifications inherent in such divided loyalties as HCA's and HC's counsel.

69.    KVCF's actions and inactions with respect to the Hale proposal and the Hale Recapitalization Transaction were in conflict with and in violation of KVCF's duties of trust and loyalty to KVCF's clients HCA and HC.

70.    On March 14, 2019, Kaplan Jr., provided written notice ("Termination Notice") to his client HCA that, pursuant to Section 10(b) of the HCA Management Agreement, his other client, the REIT, "elect[ed] not to renew the HCA Management Agreement under its terms which such nonrenewal shall take effect on March 31, 2020." At no time did KVCF advise HCA and

*Holmwood Capital Advisors, LLC et al. v. Kaplan Voekler Cunningham & Frank PLC*
Complaint
Page 18

HC that Kaplan and KVCF could undertake actions contrary to the best interests of HCA without the express authority of HCA, and to undertake actions to exclude HCA from decisions related to management of the properties within the portfolio. Even when the conflict of interest of the Kaplans and KVCF was later brought to the attention of the REIT Board of Directors, as a result of the Kaplans serving as directors and officers of the REIT,  KVCF and the Kaplans refused to be recused, contrary to their duties and obligations to HCA,  HC and the REIT. Instead KVCF and the Kaplans denied the existence of this clear and non-waivable conflict.

71.     The Termination Notice included revised investment guidelines which required the REIT Board of Directors to approve any action by HCA to investigate, pursue, negotiate, finance, acquire, sell, exchange, refinance, or dispose of any investment held by the REIT.  This was in derogation to HCA's authority and sole discretion under the HCA Management Agreement that continued to remain in effect for the next 12 months. Notwithstanding, KVCF approved actions in derogation of HCA's authority, an entity KVCF and Kaplan Jr. were obligated to represent at the same time as authorizing corporate actions contrary to the best interests of HCA and HC. Indeed, KVCF's actions were intended and designed to enhance the financial interests of the Kaplans and KVCF to the detriment of their clients HCA and HC.

72.     On March 19, 2019, the Recapitalization Transaction closed, pursuant to legal services provided by KVCF.  Hale came into control of the REIT and became controller of the REIT, despite the objections of HCA and HC.

73.     After the Termination Notice, while the HCA Management Agreement continued in effect for the next year, HCA was stripped of its authority and was caused to lose prospective fees.  Hale, with the encouragement and assistance of KVCF and the Kaplans, also directed the REIT to abandon the Regulation A Offering that HCA was contractually authorized to handle.

The REIT's premature termination of the Regulation A offering, resulted in the REIT claims against HCA for repayment of certain offering and organizational expenses, from which KVCF failed to protect its client HCA.  Furthermore, HCA is currently being sued by the REIT for these offering and organizational expenses, resulting from KVCF's misconduct.

74.      KVCF failed to advocate for HCA's rights, or to take any action to dissuade or prevent KVCF's other client the REIT from proceeding contrary to, or in violation of the HCA Management Agreement. KVCF assisted in failing to hold REIT Board of Directors' elections as required and to the detriment of HCA and HC.  KVCF also failed to undertake any action to assist HCA to obtain earned fees and the amount due for HCA's Termination Fee (instead paid in a grossly understated amount),[2]  even though KVCF had represented HCA and HC in regard to the HCA Management Agreement.

75.      Since KVCF represented HCA and HC up to the time that Hale took over the REIT, KVCF used information about HCA to help the REIT under Hale deprive HCA of economic gains.

76.      KVCF participated in the REIT's decision under Hale to abrogate payment for the management fees that would come due to HCA for acquisition of new investment properties, and for investment of the Company's capital; to urge that HCA must repay $800,254 purportedly comprised of $723,932 in organizational and offering expenses, and $76,322 in overpayment of property management fees; to refuse to pay certain property management termination fees owed for management services provided to properties owned and controlled by the Company through

---

[2] For example, to arrive at a Stockholders' Equity figure under $35 million in order to reduce the multiplier effect of HCA's Termination Fee calculation of total equity was improperly reduced by inclusion of a $1.75 million "estimate" of HCA's Termination Fee, to yield approximately $34 million.  As a determination of the Stockholders' Equity is a precondition to determining the amount of HCA's Termination Fee, preemptively reducing Stockholders' Equity by an estimate of the Termination Fee is wholly illogical.  Another example was the Company's unilateral issuance of its common stock as payment.

*Holmwood Capital Advisors, LLC et al. v. Kaplan Voekler Cunningham & Frank PLC*
Complaint
Page 20

special purpose entities and to withhold those funds, despite that these matters related to the HCA Management Agreement for which KVCF had represented HCA and HC. As a result of KVCF's actions, HCA is now subject to suit for recoupment of these expenses and payments.

77.     All of the above essentially crippled or divested HCA of its ability to raise investment capital for the REIT and to determine the REIT's investments and manage the REIT's affairs.

78.     KVCF continued as counsel for the recapitalized REIT structure and KVCF obtained a large return for minimal capital investment coincident to the ownership interest received for continuing legal service. Despite claiming that the financial interest was for legal services provided by KVCF, the Kaplans took ownership in the REIT in their own names for undisclosed reasons as the Kaplans provided services only through KVCF.

79.     Moreover, HC would not have consented to the transfer of the portfolio of properties to the REIT, had full disclosure of the loss of control and other ramifications been made and the ability of KVCF and the Kaplans to have furthered their own interests rather than those of HCA and HC through engaging in undisclosed conflict of interest transactions. At no time were HCA and HC made aware by KVCF of the potential ramifications of the actions of the members of KVCF or the detrimental impact upon the businesses of HCA and HC, with which KVCF and its members were entrusted.

80.     In addition, from time to time, HC made loans to the REIT totaling more than $400,000. The Kaplans and KVCF, despite repeated requests, failed to memorialize these loans and the applicable interest rates.  In failing to do so, the REIT under Hale's control, has refused to recognize the total loans outstanding and has to date refused to repay these loans plus interest to HC.

81.     All conditions precedent to prosecution of this action have occurred or have been satisfied or waived.

## COUNT I
## LEGAL MALPRACTICE
### (By HCA)

82.     Plaintiff HCA incorporates the allegations of the above paragraphs 1 through 78, and 81.

83.     By providing legal advice, communications, billing, and guidance, KVCF owed a duty of care to HCA to represent HCA in accordance with the relevant legal standards within the legal profession.

84.     From the formation of HCA in or about July 2014, KVCF through its attorneys was the sole legal representative of HCA and received attorney's fees for its representation, including a share of business profits and partial ownership interest for the Kaplans as principals of the KVCF. At no time did the Kaplans and KVCF provide services to HCA other than legal services. .

85.     KVCF's representation of HCA deviated from the applicable professional standard of care.

86.     KVCF prepared HCA's operating agreement in a manner contrary to HCA's future best interest, with an anti-dilution provision intended to protect the interest of the Kaplans, who gained 50% ownership of HCA as part of fee compensation for ongoing legal services of KVCF.

87.     KVCF breached the duty of care in advising HCA that equal voting of its members was required.  This was corrected in time for HCA to affirmatively disapprove the Hale transaction that would have facilitated prevention of the REIT Board's approval of the Hale Recapitalization Transaction but the Kaplans never shared the Hale proposal to the members of HCA knowing it would be rejected and instead circumvented HCA's rights under the HCA's Management

Agreement by taking the proposal directly to the REIT Board of Directors, without HCA's approval. These actions were in violation of KVCF's duties and obligations to HCA and in furtherance of unauthorized conflict of interest transactions by KVCF.

88.     Instead, the Kaplans improperly presented the Hale transaction to the REIT Board under the guise and false representation that the HCA Board was deadlocked, so the REIT had to act.  HCA had not been presented with the Hale proposal and it was not in fact deadlocked as Kurlander had gained an extra vote by acknowledgment of the Kaplans through a unanimously executed amendment to the HCA operating agreement days before they went to the REIT Board of Directors; and regardless, the REIT could not act to approve the Hale proposal without the affirmative approval and recommendation of HCA.

89.     KVCF advised that Regulation A financing was advantageous and "the only way to go," and that an independent Board for the REIT was necessary for Regulation A financing, which was untrue.  The Regulation A financing was later disavowed by the Kaplans.  This resulted in the opportunity for diminishment or rejection of HCA's authority to control the portfolio, while protecting KVCF's ongoing legal fees and detriment to HCA and HC .

90.     While KVCF acted as HCA's legal representative, KVCF simultaneously represented other parties whose interests were directly, indirectly, or potentially adverse to HCA's interests, without disclosing such adverse interests and without obtaining HCA's consent, in contravention of professional standards and professional responsibility to KVCF's client, HCA.

91.     While KVCF acted as HCA's legal representative, certain of KVCF's principals were actively engaged as investors and principals in related business entities with interests that could have been and were adverse to HCA's interests, in contravention of professional standards.

92.     While KVCF acted as HCA's legal representative, KVCF actively assisted the Hale Partnership in its takeover of HCA's managed business, enabling Hale to control the REIT to cause loss to and destruction of HCA; and after the Hale takeover, KVCF actively assisted the Hale and the REIT in causing additional loss to HCA.

93.     Through KVCF's actions, including its inadequate clarification of contractual protections, non-disclosure of critical communications and events, active opposition to the business position and best interests of its client HCA, and outright adversarial conduct contrary to those interests, KVCF's representation fell below the applicable professional standard of care.

94.     KVCF's actions above describe proximately caused damages to HCA.

**WHEREFORE**, Holmwood Capital Advisors, LLC demands judgment against Kaplan Voekler Cunningham & Frank PLC for the amount of its damages, plus interest, costs and such further relief as this Court deems just and proper.

### COUNT II
### BREACH OF FIDUCIARY DUTY
### (By HCA)

95.     Plaintiffs HCA incorporate the allegations of the above paragraphs 1 through 78, 81, and 83 through 90.

96.     At all material times, KVCF sought and accepted HCA's trust and loyalty while at the same time, KVCF's fiduciary and confidential relationship with HCA was never repudiated or terminated by KVCF.

97.     KVCF owed HCA a fiduciary duty to be trustworthy and to act loyally and in good faith toward HCA and in HCA's best interests at all times, and to not be disloyal in dealing with parties adverse to HCA, and to not expose HCA to any unnecessary risk or peril, or engage in conduct that amounted to self-dealing.

98.     KVCF breached its fiduciary duties and obligations to HCA by its actions or inactions alleged above.

99.     At no time during KVCF's representation of HCA did the Firm disclose the existence, or even a possibility, of an actual or potential conflict of interest relating to other entities represented by KVCF or as to its principals' interest in the business, and KVCF did not obtain HCA's informed consent in writing or otherwise to such conflicted representation, nor advise that HCA should engage independent counsel.

100.     Through KVCF's actions, including blatant opposition to the wishes of HCA, and outright adversarial conduct contrary to the interests of HCA, KVCF's representation violated fiduciary obligations owed to HCA and violated the duty of trust and loyalty owed to HCA.

101.     KVCF's actions in breach of its fiduciary obligation proximately caused damages to HCA resulting in ownership in HCA given to principals of KVCF as advance fees for ongoing and continuing legal services to become unearned and undeserved.

102.     KVCF's actions have caused HCA to lose control of the business operations, because of the violation of due care and conflicts of interest held and improperly acted upon by KVCF, in violation of fiduciary duties owed to HCA.

**WHEREFORE**, Holmwood Capital Advisors, LLC demands judgment against Kaplan Voekler Cunningham & Frank PLC and for the full amount of its damages, disgorgement of ownership interests provided to principals of KVCF in HCA and the REIT as fees for legal services, any legal fees paid to KVCF by HCA and the REIT, plus interest, costs, and such other and further relief as this Court deems just and proper.

## COUNT III
## LEGAL MALPRACTICE
## (By HC)

103.     Plaintiff HC incorporates the allegations of the above paragraphs 1 through 81.

104.     By providing legal advice, communications, billing, and guidance, KVCF owed a duty of care to HC to represent HC in accordance with the relevant legal standards within the legal profession.

105.     From the formation of HC in late 2010, KVCF through its attorneys was the sole legal representative of HC and received attorney's fees for its representation, including a share of business profits and partial ownership interest for the Kaplans as principals of KVCF.

106.     KVCF's representation of HC deviated from the applicable professional standard of care.

107.     KVCF's representation of HC was in violation of its duties to undertake actions in HC's best interests. Instead, KVCF pursued actions in the best interests of interests of KVCF and its Members, agents and employees. KVCF prepared HCA's operating agreement in a manner contrary to not only the best interests of HCA but the best interests of HC.  Further, KVCF failed to advise HC of its future best interests, instead acting to foster the best interests of KVCF and to protect the interests of KVCF, by allowing the Kaplans to obtain significant ownership of HCA as part of fee compensation for future legal services of KVCF, to the detriment of HC.

108.     KVCF breached the duty of care in advising HC of its best interests when it transferred the portfolio of properties owned and/or controlled by HC to the REIT. This action was undertaken at the instruction and advice of KVCF and its members for the purpose of separating HC and HCA from their property and management interests, and the control held in the real estate business enterprise set forth above. These actions were undertaken by KVCF to enhance its own

financial interests, without full disclosure to HC, and constituting unauthorized and improper conflict of interest transactions, to the detriment of HC.

109.    Instead, KVCF misrepresented the financial advantages of the transactions to HC, to its detriment and to the benefit of KVCF and its members. Further, KVCF failed to advise HC of the ramifications of the potential loss of control, that control would be lost, and that KVCF would not and had not acted in the best interests of its clients HC and HCA. KVCF also failed to advise that it would undertake conflict of interest transactions not in the best interests of HC before advising HC to transfer ownership of the portfolio of properties to the REIT.

110.    KVCF advised HC and HCA that Regulation A financing was advantageous and the only way to go, and that an independent Board for the REIT was necessary for Regulation A financing, which was untrue.  The Regulation A financing was later disavowed by the Kaplans. This resulted in the opportunity for diminishment or rejection of HCA's authority to control the portfolio, and loss of HC's ownership of its properties and loss of control over its properties through HCA.

111.    While KVCF acted as HC's legal representative, KVCF simultaneously represented other parties (and/or anticipated or planned to do so without disclosure) whose interests were directly, indirectly, or potentially adverse to HC's interests, without disclosing such adverse interests and without obtaining HC's consent to such representation in contravention of professional standards.

112.    While KVCF acted as HC's legal representative, certain of KVCF's principals were actively engaged as investors and principals in related business entities (and/or contemplated and acted in their own financial interests to create such business entities without full disclosure) with

*Holmwood Capital Advisors, LLC et al. v. Kaplan Voekler Cunningham & Frank PLC*
Complaint
Page 27

interests that could have been and were adverse to HC's interests, in contravention of professional standards.

113.    While KVCF acted as HC's legal representative, KVCF actively undertook actions to create loss of control transactions under which third-parties would take over HC's property interests managed by HCA enabling those third parties to control the properties in such a fashion to cause loss to and destruction of HC; and KVCF actively assisted those third parties in causing additional loss to HC, through the conflict of interest transactions in which KCVF engaged. Had full disclosure been made by KVCF, as required within the scope of its representation of HC, the loss of its business, property and control would not have occurred.

114.    Through KVCF's actions, including its inadequate clarification of contractual protections, non-disclosure of critical communications and events, active opposition to the business position and best interests of its client HC, and outright adversarial conduct contrary to those interests, KVCF's representation fell below the applicable professional standard of care.

115.    KVCF's actions above describe proximately caused damages to HC.

**WHEREFORE**, Holmwood Capital, LLC demands judgment against Kaplan Voekler Cunningham & Frank PLC for the amount of its damages, plus interest, costs and such further relief as this Court deems just and proper.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
### (By HC)

116.    Plaintiff HC incorporates the allegations of the above paragraphs 1 through 81, and 107 through 113.

117.     At all material times, KVCF sought and accepted HC's trust and loyalty while at the same time, KVCF's fiduciary and confidential relationship with HC was never repudiated or terminated by KVCF.

118.     KVCF owed HC a fiduciary duty to be trustworthy and to act loyally and in good faith toward HC and in HC's best interests at all times, and to not be disloyal in dealing with parties adverse to HC, and to not expose HC to any unnecessary risk or peril, or engage in conduct that amounted to self-dealing.

119.     KVCF breached its fiduciary duties and obligations to HC by its actions or inactions alleged above.

120.     At no time during KVCF's representation of HC did the Firm disclose the existence, or even a possibility, of an actual or potential conflict of interest relating to other entities represented by KVCF or as to its principals' interest in the business, and KVCF did not obtain HC's informed consent in writing or otherwise to such conflicted representation, nor advise that HC should engage independent counsel.

121.     Through KVCF's actions, including failure to disclose conflict of interest transaction existing and potential, transactions intended for the best interest of KVCF and its members rather than those of HC, and failure to disclose the best interests of HC rather than undertaking transactions for its own self-interest, KVCF's representation violated fiduciary obligations owed to HC and violated the duty of trust and loyalty owed to HC.

122.     KVCF's actions in breach of its fiduciary obligation proximately caused damages to HC resulting in ownership in HC given to principals of KVCF, directly and indirectly, as advance fees for ongoing and continuing legal services to become unearned and undeserved.

123.     KVCF's actions have caused HC to lose control of the business operations, because of the violation of due care and conflicts of interest held and improperly acted upon by KVCF, in violation of fiduciary duties owed to HC.

**WHEREFORE**, Holmwood Capital, LLC demands judgment against Kaplan Voekler Cunningham & Frank PLC and for the full amount of its damages, disgorgement of ownership interests provided to principals of KVCF in HC and the REIT as fees for legal services, any legal fees paid to KVCF by HC, plus interest, costs, and such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury on all issues so triable of right by law.

Dated this 14th day of September, 2020.

Respectfully submitted,

**OSHEROW, PLLC**
*Counsel for Plaintiffs*
2101 N.W. Corporate Blvd.
Suite 410
Boca Raton, Florida 33431
Telephone: (561) 257-0880

By: s/ *Mark R. Osherow*

**MARK R. OSHEROW**
Florida Bar No: 997013
mark@osherowpllc.com
eservice@osherowpllc.com
**KENYETTA N. ALEXANDER**
Florida Bar No: 36815
kenyetta@osherowpllc.com
eservice@osherowpllc.com

*Holmwood Capital Advisors, LLC et al. v. Kaplan Voekler Cunningham & Frank PLC*
Complaint
Page 30